| | | |
|---|---|---|
| **MIKHAIL SHAPOVALOV** | : | |
| Petitioner, | : | |
| | : | **No. 3:19-cv-00821 (VLB)** |
| v. | : | |
| | : | |
| **UNITED STATES OF AMERICA** | : | **May 17, 2021** |
| Respondent. | : | |
| | : | |
| | : | |
| | : | |
| | : | |

## MEMORANDUM OF DECISION DENYING PETITIONERS MOTION TO VACATE HIS SENTENCE PURSUANT TO 28 U.S.C. § 2255

Petitioner Mikhail Shapovalov ("Mr. Shapovalov" or Petitioner) waived indictment and pled guilty to an information charging him with Exporting Firearms without a License in violation of 22 U.S.C. § 2778 pursuant to the terms of a plea agreement. *United States v. Mikhail Shapovalov*, 3:17-cr-272, Dkt. 41 (Findings and Recommendations on Acceptance of Plea). On May 23, 2018, the Court (Bryant, *J*) sentenced Mr. Shapovalov to 34 months of imprisonment to be followed by three years of supervised release if he is not deported. *Id.* at Dkt. 80 (Crim. J).

Mr. Shapovalov brings this *pro se* motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255, asserting that the Government withheld exculpatory information and that his counsel's failure to discover this omission constituted ineffective assistance of counsel. [Dkt. 1 (Mot. to Vacate, Set Aside, or Correct Sentence)].

For the following reasons, Mr. Shapovalov's Motion to Vacate, Set Aside, or Correct his Sentence is DENIED.

## I. BACKGROUND[1]

Between March 2015 to November 2015, Mr. Shapovalov conspired to purchase firearm parts in the United States and export them at the direction of a foreign procurer in Europe. [Dkt. 49 (Pre-Sentence Investigation Report) ¶ 7].[2] When making the shipments, Mr. Shapovalov placed false descriptions of the items on the air waybills and/or the U.S. Postal Service shipping labels that accompanied the overseas packages and failed to complete or submit any required export documents. [*Id.*]. Mr. Shapovalov did not have a license to export firearms parts despite knowing that he needed the requisite license. [PSR ¶ 8]. During his pre-sentence investigation interview, Mr. Shapovalov explained that he began purchasing slides for Glock pistols to send to Russia. [PSR ¶ 12]. He added that "I never bought anything illegal. I just didn't have a license to ship it." [PSR ¶ 14].

On February 22, 2017, the Honorable William Garfinkel, United States Magistrate Judge, authorized a criminal complaint charging Mr. Shapovalov with making false statements, money laundering, conspiracy, and violating the Arms Export Control Act ("AECA"), in violation of 18 U.S.C. § 1001, 18 U.S.C. § 1956(a)(2)(A), 18 U.S.C. § 371, and 22 U.S.C. § 2778, respectively. [Dkt. 1 (Compl.)]. Defendant was

---

[1] Unless specified otherwise, all docket numbers in the Background section will refer to filings under 3:17-cr-00272 (VLB), Mr. Shapovalov's criminal case that produced this petition.

[2] At sentencing, the Court canvassed Mr. Shapovalov as to whether he was interviewed by Probation in the presence of his counsel, whether he read the presentence report and whether he disagreed with any of the facts as stated in the presentence report. [Dkt. 79 (Sent. Hr'g Tr.) 2:04-3:58]. Neither the Defendant, nor defense counsel, nor the Government had any objections to the facts as stated in the PSR. [*Id.* at 5:09-5:27]. The Court adopted the PSR as its findings of fact. [*Id.*].

arrested and appeared before Judge Garfinkel the following day. [Dkt. 6 (Feb. 23, 2017 Min. Entry)]. Attorney Charles Willson of the Federal Public Defender's Office was appointed to represent Mr. Shapovalov. [Dkt. 9 (Order Appointing Federal Public Defender)]. He was released on bond on March 2, 2017. [Dkt. 14 (Order Setting Conditions of Pre-trial Release)].

On December 8, 2017, Mr. Shapovalov waived his right to prosecution by indictment [Dkt. 36 (Waiver of Indictment)] and petitioned the Court to enter a guilty plea for the charge of exporting munitions without a license in violation of 22 U.S.C. § 2778. [Dkt. 39 (Petition to Enter Plea of Guilty)]. The one-count information alleged that on or about April 6, 2015, Mr. Shapovalov exported a barrel and breech casing for a Glock carbine pistol with the markings "G17 19123 mech-tech made in USA" from the United States to Latvia.[3] The barrel and breech casing were designated as Category I defense articles on the United States Munitions List, 22 C.F.R. § 121.1, and Mr. Shapovalov had neither the required license nor written authorization to make such a transaction. [Dkt. 35 (Information) at 2–3]. In his plea petition, Mr. Shapovalov declared the following: "I sent gun parts out of the country that I

---

[3] For context, according to the manufacturer's website, the model number (G17 19123) corresponds to a pistol-to-carbine conversion kit. Mech Tech, https://mechtechsys.com/ccu-models/glock (last visited May 17, 2021). The conversion kit allows the operator to fire a semi-automatic pistol like a carbine rifle because of the longer barrel, hand guard, and stock provided by the kit. The manufacturer advertises that users can "[e]xtend the effective range of your Glock, 1911 or XD family handgun from 25ft. to well over 100yds. simply by installing the MechTech Carbine Conversion Unit (CCU)." Mech Tech, https://mechtechsys.com (last visited May 17, 2021).

bought for someone out of the country. I did not have a license to do that. My actions were willful. I had this written for me with the help of the interpreter." [Dkt. 39 (Plea Petition)].

Mr. Shapovalov agreed not to appeal or collaterally attack his conviction in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255, and not to challenge the sentence imposed by the Court if it did not exceed 57 months' imprisonment, a three-year term of supervised release, a $100 special assessment, and a fine of $200,000. However, the agreement also states that "[n]othing in the foregoing waiver … shall preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum." [Dkt. 40 (Plea Agreement) at 4–5].

The parties, the probation office, and the Court agreed that the guideline stipulation in the plea agreement was correct. The base offense level under U.S.S.G. § 2M5.2 was 26. Three levels were subtracted under U.S.S.G. § 3E1.1 for timely acceptance of responsibility. Petitioner had a recent state conviction for Operation of a Motor Vehicle Under the Influence of Alcohol or Drugs, resulting in a single criminal history point, placing him in Criminal History Category I. [PSR ¶ 27]. This resulted in a guideline calculation of 46-57 months incarceration, a supervised release period of one to three years, and a fine of $20,000. [Sent. Hr'g Audio at 38:42-39:24].

At sentencing, the Court considered that the laws Mr. Shapovalov violated were critical to national security and foreign policy. The Court noted that the Russian government was involved in the detection of the offense, as the weapons components Mr. Shapovalov shipped to Latvia were then smuggled into Russia. [*Id.* at

40:08-41:50]. The Court rejected defense counsel's argument that the guideline range reflected the need to deter the theft and proliferation of sophisticated military technology whereas Defendant's offense conduct involved small arms parts. *See* [Dkt. 51 (Def. Sent. Mem.) at 4-6]. The Court reasoned that although small arms were less pernicious sounding than other weaponry, they could still be lethal and politically destabilizing through assassinations of leaders of state. [*Id.* at 40:40-41:51]. Mr. Shapovalov purchased 75 items for illegal export. [*Id.* at 41:51-42:14]. The Court also made clear that designation of the firearms parts under the Munitions List was the prerogative of the U.S. State Department's Directorate of Defense Trade Controls. [*Id.* at 45:37-46:19]. The Court was concerned that Mr. Shapovalov involved his wife in the conspiracy and expressed concern to his foreign counterpart about the frequency with which his wife dispatched these illegal packages. [*Id.* at 42:21-43:11]. This demonstrated efforts by Mr. Shapovalov to evade detection.

Unfortunately, Mr. Shapovalov's pre-trial adjustment was poor. He repeatedly violated the terms of his curfew, including twice in the months of sentencing despite prior admonishment by Probation and the Court. This suggested a lack of self-control and the need of the sentence to foster respect for the law. [*Id.* at 47:27-49:03].

Taking into consideration the purposes of sentencing and the entire record in the case, the Court sentenced Mr. Shapovalov to 34 months' imprisonment, three years of supervised release if not deported, and a special assessment of $100. [Dkt. 80 (Crim. Judgment)].

On May 24, 2019, Mr. Shapovalov filed the instant "Motion to Open and/or Set Aside Judgment." *Shapovalov v. United States*, 3:19-cv-00821 (VLB), [Dkt. 1]. He argues that his conviction should be set aside because the United States government was seeking to remove from the U.S. Munitions List the firearm parts he illegally exported. He asserts that the Government should have disclosed this proposed change before sentencing and that Attorney Willson's failure to discover it constitutes ineffective assistance of counsel. *Id.* at 1–2.

## II. LEGAL STANDARD

### A. Habeas Claims Under § 2255

Section 2255 enables a prisoner in federal custody to petition a federal court to vacate, set aside, or correct a sentence. 28 U.S.C. § 2255(a). Relief under § 2255 is generally available to rectify three irregularities, namely "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in complete miscarriage of justice." *Graziano v. United States*, 83 F.3d 587, 589–90 (2d Cir. 1996) (quoting *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995)). The strictness of this standard embodies the recognition that collateral attack upon criminal convictions is "in tension with society's strong interest in [their] finality." *Ciak v. United States*, 59 F.3d 296, 301 (2d Cir. 1995). Even an error that may justify reversal on appeal will not necessarily support a collateral attack on a final judgment. *Napoli v. United States*, 32 F.3d 31, 35 (2d Cir. 1994).

In general, a claim may not be presented in a habeas petition where the petitioner failed to raise the claim on direct review. *Zhang v. United States*, 506 F.3d

162, 166 (2d Cir. 2007). *See also Campino v. United States*, 968 F.2d 187, 190 (2d Cir. 1992) ("[F]ailure to raise a claim on direct appeal is itself a default of normal appellate procedure."). A writ of habeas corpus "will not be allowed to do service for an appeal." *Reed v. Farley*, 512 U.S. 339, 354 (1994). Where the petitioner has failed properly to raise his claim on direct review, the writ is available "only if the petitioner establishes cause for the waiver and shows actual prejudice resulting from the alleged … violation." *Id.* at 354 (quotations omitted). This rule is rooted in concern for the finality of judgments, the accuracy and integrity of prior proceedings, and the interests of judicial economy. *Chibuko v. United States*, No. 3:16-cv-02098(VLB), 2020 WL 1140888 at *5 (D. Conn. Mar. 9, 2020) (citing *Campino*, 968 F.2d at 190). Collateral review of convictions "places a heavy burden on scarce judicial resources, may give litigants incentives to withhold claims for manipulative purposes, and may create disincentives to present claims when evidence is fresh." *Campino*, 968 F.2d at 190 (quoting *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 7 (1992). A sentencing claim raised for the first time on habeas review should be denied on the grounds of procedural default, which can only be overcome by showing cause and prejudice. *Chibuko*, 2020 WL 114088 at *5.

### B. Appeal Waiver

The Second Circuit has consistently upheld the validity and enforceability of appeal or collateral attack waivers contained in plea agreements, subject to narrow exceptions. *United States v. Gomez-Perez*, 215 F.3d 315, 318 (2d Cir. 2000)(citations omitted). In this case, Petitioner waived the right to appeal or collaterally attack a

sentence that did not exceed 57 months, a three-year term of supervised release, and a $100 special assessment. [Dkt. 40 (Plea Agreement) at 4-5].

The "exceptions to the presumption of enforceability of a waiver ... occupy a very limited circumscribed area of our jurisprudence." *Gomez-Perez*, at 318 F.3d at 319. A plea waiver is valid when made knowingly, voluntarily, and competently by the defendant. *Id.* at 318. The limited exceptions to enforceability are when: "the sentence was imposed based on constitutionally impermissible factors, such as ethnic, racial or other prohibited biases, see *United States v. Jacobson*, 15 F.3d 19, 22–23 (2d. Cir. 1994), when the government breached the plea agreement, *see United States v. Rosa*, 123 F.3d 94, 98 (2d Cir. 1997) (citing U*nited States v. Gonzalez*, 16 F.3d 985, 990 (9th Cir.1993)), or when the sentencing court failed to enunciate any rationale for the defendant's sentence, thus "amount[ing] to an abdication of judicial responsibility subject to mandamus." *United States v. Yemitan*, 70 F.3d 746, 748 (2d. Cir. 1995)." *Id.* at 319. None of these factors are at issue here.

Later, the Second Circuit also held that a defendant "may sign away the right to appeal, but he or she does not sign away the right to the effective assistance of counsel." *Campusano v. United States,* 442 F.3d 770, 777 (2d Cir. 2006). Thus, the narrow issue here is whether Petitioner can establish a claim for ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), not whether his underlying objections are meritorious.

<u>C. Necessity of Hearing</u>

In response to a habeas petition, the court shall grant a prompt hearing "[u]nless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). "It is within the district court's discretion to determine whether a hearing is warranted." *Pham v. United States*, 317 F.3d 178, 184 (2d Cir. 2003). The need for a hearing may be diminished if the same court presided over the underlying proceedings and therefore is "intimately familiar with the detailed factual record." *United States v. Aiello*, 900 F.2d 528, 534 (2d Cir. 1990). *See also Puglisi v. United States*, 586 F.3d 209, 214 (2d Cir. 2009). Even where factual issues may exist, the Second Circuit allows district courts to resolve such disputes through written submissions rather than by holding a hearing. This is a "middle road" between summary rejection and a full hearing. *Pham*, 317 F.3d at 184. Although habeas petitions from *pro se* litigants should be liberally construed, if the petitioner does not raise issues that are sufficient to require a hearing, the court is not obligated to hold one. *See Johnson v. Fogg*, 653 F.2d 750, 753 (2d Cir. 1981).

## III. DISCUSSION

Before considering the merits of Mr. Shapovalov's constitutional claims, some background about the legal framework of U.S. arms control policy is necessary to provide context for the basis for Mr. Shapovalov's convictions and his habeas claims.

Mr. Shapovalov pled guilty and was convicted of violating the Arms Export Control Act, which regulates the commercial export of "defense articles" from the United States. 22 U.S.C. § 2778. The statute provides that: "furtherance of world

peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles … The President is authorized to designate those items which shall be considered as defense articles … The items so designated shall constitute the United States Munitions List." § 2778(a)(1). Subsection (b) of the statute sets forth the requisite registration and licensing requirements for manufacturers, exporters, or importers of designated defense articles and defense services. § 2778(b). Subsection (c) makes it a criminal offense to willfully violate any provision of the section, punishable by imprisonment for not more than twenty years and/or a fine of not more than $1,000,000.

By executive order, the President delegated authority to designate "defense articles" to the U.S. Department of State. Exec. Order 13,637. The State Department, through its Directorate of Defense Trade Controls, promulgated the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120.1–130.17.

The offense conduct in this case occurred between March 2015 to November 2015. [PSR ¶ 7]. At the time of the offense, "nonautomatic and semi-automatic firearms to caliber .50 inclusive" and " (g) Barrels, cylinders, receivers (frames) or complete breech mechanisms for the articles in paragraphs (a) through (d) of this category," were Category I articles. § 121.1. There is no dispute that at the time of his offense conduct, the carbine conversion kit was classified as a defense article under Category I of the U.S. Munitions List.

On May 24, 2018, the day after Mr. Shapovalov's sentencing, the Department of State's Directorate of Defense Controls proposed removing these firearm com-

ponents from the U.S. Munitions List. *See* Dep't of State, Proposed Rule, International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, III, 83 FR 24198 (May 24, 2018). The intention of the proposed rule was to "revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use." *Id.* at 1. Absent exceptions not relevant here, the proposed rule would remove non-automatic and semi-automatic firearms to caliber .50 inclusive and their "parts, components, accessories, and attachments" from the U.S. Munitions List. *Id.* at 1. The proposed rule indicated that export controls of these items would be addressed by the Department of Commerce. *Id.*

On the same day that the proposed rule amending the U.S. Munitions List was published by the State Department, the Department of Commerce published a companion rule to control the export of firearms, ammunition, and other articles previously controlled under Category I-III of the U.S. Munitions List. Dep't of Commerce, Bureau of Indus. and Sec., Proposed Rule, Control of Firearms, Guns, Ammunition and Related Article the President Determines No Longer Warrant Control under the United States Munitions List (USML), 83 FR 24166 (May 24, 2018).

The State Department's final rule amending ITAR and the Department of Commerce's companion rule were promulgated on January 23, 2020, with an effective date of March 9, 2020. Int'l Traffic in Arms Regs.: U.S. Munitions List. Categories I, II, III, Final Rule, 85 FR 3819; Control of Firearms, Guns, Ammunition and

Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), Final Rule, 85 FR 4136-01.

Under the new regulations, the Department of Commerce's Bureau of Industry and Security ("BIS") will "require authorization to export or reexport to any country a firearm or other weapon that is being moved from the USML to the CCL by this final rule …." *Id.* For reasons of national security and regional stability, the BIS requires a license to export the "parts" and "components" at issue in this case to Latvia. See ECCN 0A501, 15 C.F.R. Supp. 1 to Pt. 774, Cat. 0, Supplement No. 1 to Part 738, 8 (Commerce Country Chart) (last modified Jan. 14, 2021). Mr. Shapovalov's conduct would therefore be unlawful and punishable (though not under 22 U.S.C. § 2778) even after the adoption of the new rule. *See* 50 U.S.C. § 1705 (a) and (c) (willful violation of export controls, including United States Commerce Control List, upon conviction, is punishable by imprisonment for not more than twenty years and/or a fine of not more than $1,000,000.); *see e.g. United States v. John*, No. 15 CR 208 (CM), 2020 WL 6581217, at *1 (S.D.N.Y. Nov. 10, 2020)(denying motion for compassionate release brought by defendant convicted of attempting to smuggle firearms and firearms components to Pakistan in violation of 50 US.C. § 1705(a) and (c)).

In short, notwithstanding some changes concerning how the export of small arms are regulated, the underlying federal policy of preventing the proliferation of small arms to unstable regions remains an important national security consideration.

A. <u>Petitioner's argument</u>

Mr. Shapovalov argues that "knowledge of the proposed rule change was critical" to both his decision to plead guilty and to the Court in determining his sentence. He claims that if the Government had disclosed the proposed change, a lesser sentence likely would have been imposed. [Dkt. 1 (Compl.) at 6]. Mr. Shapovalov concedes that the proposed regulatory changes did not come into effect until after his sentencing. He nevertheless argues that he would likely have prevailed on a challenge attacking the sufficiency of the Government's case. [Dkt. 1 (Def. Mem. in Supp.)].

He also argues that, considering the revision, his sentencing might have been different and that he might invoke the protections of the Second Amendment. [*Id.* at 5]. Mr. Shapovalov argues that the Department of Justice was aware of the State Department's proposed change as early as April of 2018, as evidenced by *Washington v. United States Dep't of State*, 318 F. Supp.3d 1247, 1263 (W.D. Wash. 2018)("The federal government represents that its settlement with the private defendants was the result of a multi-year review process in which the Departments of Defense, Commerce, and State determined that firearms up to .50 caliber would not provide a military advantage to adversaries and therefore no longer warrant export control and should be removed from the USML.").

Mr. Shapovalov argues that Attorney Willson conducted an insufficient investigation because a cursory internet search would have produced industry websites discussing the proposed changes to ITAR. [Def. Mem. in Supp. at 7-8]. Defendant contends that this amounted to Attorney Willson's failure to research the

elements of the offense. [*Id.*](citing *Jackson v. Conway*, 763 F.3d 115, 155 (2d Cir. 2014)).

In opposition, the Government argues that Mr. Shapovalov is not entitled to relief because the proposed regulation was not in effect at the time of the offense conduct and there is no indication that the regulation would apply retroactively. [Gov. Mem. in Opp'n at 15-17]. The Government argues that repeal of a regulation does not preclude prosecution for violations occurring while that regulation was in effect. [*Id.* at 17-19](citing *United States v. Hark*, 320 U.S. 531, 536 (1944)). The Government argues that Mr. Shapovalov cannot show that information pertaining to the proposed regulatory change was so material that there is a reasonable probability that it would have produced a different outcome under *Brady* or *Strickland*. [Gov. Mem. in Opp'n at 21].

The Court agrees with the Government.

B. <u>Whether the failure to disclose the proposed rule change violates *Brady*.</u>

*Brady v. Maryland*, 373 U.S. 83, 87 (1963) requires disclosure of material that is favorable to the accused and "material to either guilt or punishment." To prove a *Brady* violation, a defendant must show that the evidence at issue is favorable to the accused because it is either exculpatory or impeaching. *Strickler v. Greene*, 527 U.S. 263, 281 (1999). Evidence is exculpatory or impeaching if it "'may make the difference between conviction and acquittal' had it been 'disclosed and used effectively.'" *United States v. Bagley*, 473 U.S. 667, 676 (1985). The evidence must also have been suppressed by the State, either willfully or inadvertently. *Strickler*, 527 U.S. at 282. Evidence cannot be suppressed, however, if the defendant either knew

or should have known of the essential facts that would allow him to take advantage of any exculpatory evidence. *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993); *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)(citations omitted). Finally, the defendant must have been prejudiced because of the government's suppression. *Strickler*, 527 U.S. at 282. This requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

Here, neither party addresses how a proposed regulatory change constitutes "evidence" for *Brady* purposes or how it was "suppressed" by the Government in this case. Evidence is not "suppressed" if the Petitioner or his counsel knows or should have known the essential facts permitting him to take advantage of the material. Petitioner argues that the information concerning the State Department's forthcoming proposed rule was available to anyone through a Google search. [Def. Mem. in Supp. at 7, n.2](citing *Announcement on Export Control Reform*, Orchid Advisers, May 14, 2018, https://orchidadvisors.com/announcement-on-export-control-reform/).[4] *Sept. 8, 2017 Meeting Notes*, U.S. Dep't of State, Def. Trade Advisory Grp. https://www.pmddtc.state.gov/embargoed_countries/?id=ddtc_public_portal_news_and_events&cat=DTAG&timeframe=range2017-09-01to2017-09-30.

---

[4] The U.S. Department of State, Directorate of Defense Trade Controls (DDTC) has announced on its website the long-awaited Export Control Reform (ECR) rules applicable to U.S.M.L. Categories I, II and III. The proposed new rules will be published in the Federal Register within the next few days and then will be subject to a 45-day comment period. It is too soon to say when the new rules will go into effect. That will depend on the public comments received and the Governments response to the comments.

If the crucial information was so obvious that failing to find it constituted deficient representation, then by definition it could not have been suppressed. *See Zackson*, 6 F.3d at 918. Conversely, if Mr. Shapovalov's conviction and sentencing are attributable to the Government's failure to disclose this information, it is illogical to fault his counsel for that outcome. It cannot be both ways. The Court need not address whether the information constitutes "evidence" or whether it was suppressed because the Court agrees with the Government that Petitioner cannot establish the materiality of the information.

There is no dispute that the firearm components at issue were on the list of prohibited munitions at the time that Mr. Shapovalov exported them. Mr. Shapovalov argues that the judgment became final when it was docketed on May 29, 2018 and thus the proposed regulatory amendments were published before the judgment was entered. [Def. Mem. in Supp. at 2-3](citing Fed. R. Crim. P. 32(k)). This is a distinction which makes no difference.

Mr. Shapovalov's actions were illegal under 22 U.S.C. § 2778 at the time he committed the offense and when he pled guilty, and it remained so at sentencing. As discussed *supra.*, the proposed ITAR amendments were not published until the day after sentencing. The docketing of the written criminal judgment does not affect this analysis because it is the oral pronouncement of the sentence that is the enforceable judgment. *United States v. Marquez*, 506 F.2d 620, 622 (2d Cir. 1974); Fed. R. Crim. P. 35(c)(defining sentencing as the oral pronouncement of the sentence).

Mr. Shapovalov has accurately summarized the State Department's motivation for amending the munitions list. [Dkt. 1 (Compl.) at 4]. However, a compelling policy rationale for changing a law does not excuse prior violations. *See Taylor v. Sessions*, 714 Fed. Appx. 85, 87 (2d Cir. 2018) (summary order) (rejecting petitioner's contention that amending a law constitutes an admission of a defect that would undermine convictions under that law) ("[The Connecticut legislature's decision to reduce the penalty for marijuana possession] does not render an otherwise valid past conviction procedurally or substantively defective."); *Ghorashi Sarvestani v. United States*, No. 13 Cr. 214 (PGG), 2015 WL 7587359, * at 14-15 (denying habeas relief to petitioner arguing that the export regulation he pled guilty to violating had been repealed by the time of his sentencing).

Given that the Supreme Court has held that not even revoking a regulation will prevent indictment and conviction for violating its provisions at a time when it was in force, *United States v. Hark*, 320 U.S. 531, 536 (1944), a potential regulatory change is not a sound basis to set aside a conviction or sentence.

Mr. Shapovalov claims that had the proposed rule change been disclosed, he "would likely have prevailed on a challenge attacking the sufficiency of the government's case against him". [Dkt. 1 (Compl.) at 4]. There is no basis for this assumption. With no indication that the proposed revision would apply retroactively, "it is the law at the time of the offense … that governs." *United States v. Smith*, 354 F.3d 171, 173 (2d Cir. 2003). Mr. Shapovalov was properly convicted according to the law at the time the offense was committed.

A prospective regulatory change has no bearing on the criminality of Mr. Shapovalov's conduct at the time it occurred, and he has no legal grounds to expect leniency in sentencing based on business publications about an anticipated proposed change in ITAR regulations. Mr. Shapovalov argued in a supplemental sentencing memorandum and again at sentencing that the components he exported differed from other types of sophisticated military hardware on the U.S. Munitions List. [Dkt. 56 (Suppl. to Def't Mem.) at 4]. The Court deferred to the executive branch as to how the contents of the list should be classified and pointed out that small arms are often used in assassinations and can pose a national security risk. [Dkt. 79 (Sentencing Hr'g Audio) at 40:10–41:50, 45:35–46:20].

Even if the proposed change had been announced earlier, the proposed rule would still wind through the administrative process and stakeholders' views would have been considered, which could have affected its content. The firearm parts in question were eventually removed from the U.S. Munitions List, effective March 2020. But the fact that the rule was adopted years later in a different form is evidence of the uncertainty of the political process and illustrates why speculation on possible future regulatory changes should not be part of sentencing. The export of these items without a license was not, as Petitioner contends, defelonized. Rather, the administrative bulwark for regulating the export of these items shifted to a different cabinet department, subject to new regulations. These regulations continue to reflect the national security risk posed by the proliferation of firearms and their components to unstable regions. More importantly, nothing in the regulations, the

enacting statute, or subsequent legislation suggest that the changes were intended to apply retroactively.

Considering the specific circumstances effecting the sentence here, Russian law enforcement alerted their U.S. counterparts to the smuggling operation, which itself demonstrates the serious nature of the criminal activity. [Dkt. 79 (Sentencing Hr'g Audio) at 40:25–40:55]. Mr. Shapovalov's poor adjustment to pre-trial supervision (multiple curfew violations, including twice during the month before his sentencing) [Dkt. 81 (Status Report)], the fact that he was a sophisticated actor with a college degree and foreign military experience, that he engaged his wife as an unindicted co-conspirator, that he undertook efforts to evade detection, and the number of firearm components illegally exported, suggested the need for a lengthy sentence.

In imposing a sentence of 34 months' incarceration and no fine, the Court already departed downward from the sentencing guidelines, which called for a minimum of 46 months and a fine of $20,000. Taking all these factors into consideration, Mr. Shapovalov's sentence suitably reflects the seriousness of his offense and the surrounding circumstances, as required by 18 U.S.C. § 3553(a).[5]

---

[5] This sentence is consistent with others imposed for illegally exporting firearm parts on the Commerce Control List. For example, in *John v. United States*, No. 17 CV 6368 (CM), 2019 WL 1511023 (S.D.N.Y. Mar. 20, 2019), discussed supra. the Southern District of New York denied the defendant's § 2255 petition challenging his sentence of 71 months' imprisonment for pleading guilty to illegally exporting firearm components. Other than an obstruction of justice enhancement in the offense level calculation, the case is analogous with the instant one. The defendant had attempted to bring an optical scope, a laser aimer, and two sights—which, like the components Mr. Shapovalov exported, were available commercially—onto an airplane bound for Pakistan. Although these items were not on the Munitions List,

## C. Ineffective Assistance of Counsel

Claims of ineffective assistance of counsel are analyzed under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). The movant must first allege facts demonstrating that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 694. The court "must indulge a strong presumption" that counsel's conduct constituted reasonable professional assistance. *Id.* at 689. The standard requires "[i]ncompetence under 'prevailing professional norms'", not just that counsel "deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690). Omissions arising from "oversight, carelessness, ineptitude, or laziness" rather than trial strategy are "indicative of deficient performance." *Saxon v. United States*, 695 Fed. Appx. 616, 619 (2d Cir. 2017) (quoting *Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003)). However, "the Sixth Amendment does not require counsel to anticipate changes in the law or make objections based on 'developments in the law that occurred *after* [defendant's trial].'" *Saxon*, 695 Fed. Appx. at 620 (quoting *McCoy v. United States*, 707 F.3d 184, 187 (2d Cir. 2013) (per curiam)(emphasis in original); s*ee also Tellado v. United States*, 745 F.3d 48, 55 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 125 (2014) (holding that counsel was not deficient in failing to anticipate changes in law under which defendant's *Alford* pleas would no longer qualify as predicate offenses for sentencing purposes).

---

the court emphasized the seriousness of this conduct and imposed the maximum guidelines sentence.

The second prong requires that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. To prevail, the movant must demonstrate "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In *Strickland*, for example, the defendant was not prejudice by counsel's failure to present certain mitigating evidence at a capital sentencing hearing because it would not have altered the profile presented to the sentencing judge and could have exposed additional aggravating factors. *Id.* at 700.

"The court's central concern is not with 'grad[ing] counsel's performance,' but with discerning 'whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.'" *United States v. Aguirre*, 912 F.2d 555, 561 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 696–97). The *Strickland* standard for ineffective counsel "is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (quoting *Linstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001)).

Mr. Shapovalov claims that Attorney Willson's research was inadequate and asserts it is "highly likely" he would have withdrawn his guilty plea if he had been aware of the proposed changes to the munitions list. [Dkt. 1 (Compl.) at 7]. On one hand, Mr. Shapovalov demonstrated that information about the proposed changes was readily available online. [Dkt. 1 (Compl.) at 3, 4, 7]. However, the proposed new

rules were only published on May 24, 2018, the day *after* Mr. Shapovalov's sentencing hearing. Although the proposed changes had been discussed for some time, Mr. Shapovalov's case was concluded by the time they were announced to the public. It may be that "best practices" call for counsel to stay abreast of potential changes to regulations implicated in cases they are trying, even changes that have not yet been formally proposed. But the law does not require best practices to reach the bar of professional, competent assistance. *Harrington*, 562 U.S. at 105. The potential rule change was speculative at the time that Mr. Shapovalov was convicted and sentenced. It is well established that counsel cannot be expected to anticipate changes in the law, particularly those that come after the defendant has already been tried. Failing to note a yet-unpublished proposed change to a regulation is not the type of unreasonable oversight contemplated in *Strickland*. *Compare with Cornell v. Kirkpatrick*, 665 F.3d 369 (2d Cir. 2011) (holding that overlooking favorable controlling precedent determining venue as a result of shoddy research was deficient representation where it was determinative of whether two sexual assault charges could be tried together).

In arguing that Attorney Willson's research was inadequate, Mr. Shapovalov relies on *Jackson v. Conway*, 763 F.3d 115, 155 (2d Cir. 2014) (noting that failure to research the elements of a crime with which the defendant was charged "undoubtedly constitutes deficient performance"). There is no evidence, however, that Attorney Willson was unfamiliar with the statute that Mr. Shapovalov was convicted of violating, nor that the Court misapplied the law as it stood at the time of the

offense. The Second Circuit has made clear that counsel is "not required to fore-cast changes or advances in the law" to provide effective representation. *Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001). Attorney Willson could not be expected to advise Mr. Shapovalov based on how pertinent regulations might change in the future—much less on changes that were only speculative at the time. Mr. Shapovalov raised no concerns about Attorney Willson's representation for the duration of the proceedings. Given that "there are countless ways to provide effec-tive assistance in a given case", *Strickland*, 466 U.S. at 689, and that the Court must make every effort to "eliminate the distorting effects of hindsight", *Id.* at 669, the Court concludes that Attorney Willson's representation satisfied an objective standard of reasonableness.

In determining whether counsel's unprofessional errors were material to the result of the case, the Court uses the same standard as in considering whether evidence has been suppressed. *Bagley*, 473 U.S. at 682–83. Assuming, *arguendo*, that Attorney Willson's failure to discover the proposed rule change was unreason-able, Mr. Shapovalov would still need to show that there was a "reasonable proba-bility" that, but for his counsel's deficient representation, the result of the proceed-ing would have been different. As the earlier analysis makes clear, the Court finds no indication that introducing the proposed rule change would have materially af-fected Mr. Shapovalov's conviction or obligated the Court to impose a lesser sen-tence. Although he suggests that he would have been less inclined to plead guilty, since the law had not changed, having knowledge of the proposed rule change

would not have mitigated Mr. Shapovalov's guilt or influenced his sentence in any way.

### C. Necessity of Hearing

Although courts generally "look with disfavor on summary rejection of a habeas petition," *Aiello*, 900 F.2d at 534 (quotation omitted), the text of § 2255 provides that the Court need not conduct a hearing where "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." Having adjudicated Mr. Shapovalov's criminal case, this Court is abundantly familiar with the factual and procedural background of this matter. Both Mr. Shapovalov and the Government had the opportunity to submit memoranda for the Court's consideration and have done so. Their positions and the authority they cite are clear. Mr. Shapovalov has not raised any issues that require additional proceedings to resolve. He argues that a hearing should be held so that the government can be compelled to "disclose internal documents concerning the proposed changes." [Dkt. 1 (Compl.) at 6]. However, because the text of the proposed revisions is already available, and because it is readily apparent that Mr. Shapovalov's behavior was and remains illegal, such documentation would not affect the disposition of this motion. The record of the case shows conclusively that Mr. Shapovalov is not entitled to relief on his claims, so it is not necessary for the Court to conduct a hearing.

### IV. CONCLUSION

For the reasons stated above, Mr. Shapovalov's Motion to Vacate, Set Aside, or Correct Sentence is DENIED. The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: May 17, 2021